IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 12, 2009 Session

## IN RE S.R.M.

**Appeal from the Juvenile Court for Blount County**
**No. 16415     William T. Denton, Judge**

_____

**No. E2008-01359-COA-R3-PT  - FILED MARCH 27, 2009**

_____

This appeal involves a petition filed by the State of Tennessee, Department of Children's Services, to terminate the parental rights of a biological father to his now ten-year-old daughter.[1]  The Juvenile Court granted the petition and the father has appealed.  After carefully reviewing the record and relevant legal authority, we affirm the Juvenile Court's finding of abandonment and the judgment terminating the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ. joined.

Robert W. White, Maryville, Tennessee, for Appellant, J.W.J.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Douglas E. Dimond, Assistant Attorney General; Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I.  FACTUAL BACKGROUND

The child, S.R.M.,[2] was born on December 16, 1998.  Her father, J.W.J. ("Father") was acquainted with S.A.M., the child's mother ("Mother") in a brief relationship before the child's conception.  Father married his present wife ("Wife") on May 22, 1999.

_____

[1]The petition sought to also terminate the parental rights of the biological mother, who is not a party to this appeal.

[2]Initials will be used to protect the anonymity of the children discussed in this matter.

S.R.M. and her half-sister, H.M.H.,[3] came into the custody of the Department of Children's Services ("DCS") on October 28, 2004. According to Mother, she put her daughters into state custody in order to keep them safe from her abusive relationship with H.M.H.'s father. DCS petitioned for custody of both S.R.M. and H.M.H on November 1, 2004, alleging that H.M.H., an infant, had tested positive for marijuana and benzodiazepines at birth. DCS further alleged that Mother had not complied with a safety plan requiring her to address her drug issues and had continued her involvement in a violent relationship. The children were placed in DCS custody by an order of the Juvenile Court entered the same day as the petition.

A Permanency Plan ("Plan") was developed for S.R.M. on November 18, 2004. The Plan listed Father as S.R.M.'s putative father with his whereabouts unknown. The only requirement of Father pursuant to the Plan was that he contact DCS within thirty days of receiving notice and enter into a Permanency Plan.

At the hearing before the Juvenile Court Referee, DCS case manager Anita Delaney testified that shortly after the Plan was developed, she located Father through his employer. When Father returned her call on November 24, 2004, Ms. Delaney informed him that S.R.M. was in state custody and that DCS had prepared a Plan in his absence. According to Ms. Delaney, she offered to mail Father a copy of the Plan, but he told her that he would pick it up at the DCS office. Father never showed up at the office, so DCS mailed the Plan by certified mail to the home address Father had provided.

DCS case manager Janell Reeves testified that she subsequently telephoned Father twice to ask him to become involved in the planning for S.R.M. According to Ms. Reeves, Father told her that "he didn't want to be involved because the mother is crazy and . . . on drugs." Ms. Reeves offered to come to his home to discuss the matter, but Father informed her that he did not want to involve his current family. When Ms. Reeves visited anyway, Father again indicated to her that he did not want to be involved and rejected the monthly visitation with S.R.M. that DCS offered. Ms. Reeves noted that she offered Father a visit with S.R.M. around Christmas 2004, at which time he could bring the child some presents. She recalled that Father dropped off some gifts but declined the opportunity to visit. Ms. Reeves testified further that Father never inquired about S.R.M.'s well-being during her time as the case manager. She noted that she was shocked by his lack of concern for his child and observed that she had never experienced such a response from a parent. Subsequently, in January 2005, DCS moved to ratify the Permanency Plan developed without any input from Father.

DCS case manager Rebecca Rowland took over the case around August 2005. She testified that she was initially unable to get Father to return her phone calls. When she learned that the case was headed for termination of parental rights, she contacted Father to inquire whether he wanted to

---

[3]The petition further sought to terminate the parental rights of both biological parents to this child. H.M.H. has a different father than S.R.M.

surrender his rights. He returned her call on September 22, 2005, at which time he indicated that he might be interested in custody of S.R.M. if Mother was out of the picture.[4] In his discussion with Ms. Rowland, Father described Mother as psychotic. He expressed fear that Mother would manufacture child sexual abuse allegations against him like she had purportedly made against the father of one of her other children. During her testimony, Ms. Rowland described a conversation with Father regarding the allegations of sexual molestation in S.R.M.'s home:

BY DCS COUNSEL:

Q. Did [Father] discuss whether or not he was concerned about the sexual molestation in that home?

A. Yes.

Q. What, if anything, did he say about that?

A. He said he had heard one of the men she had living in the home had molested one of the children.

Q. And what, if anything, did he do about that?

A. He didn't say that he did anything.

Q. In that conversation, did he say he was concerned for [S.R.M.'s] well being while she had lived with her mother?

A. No.

Q. Did he express concern for his well being?

A. Yes. In the sense that he said that he was afraid that [Mother] would accuse him of something if he had taken [S.R.M.] into his home.

Q. Did he talk about if he wanted her if [Mother] continued to be involved in her life?

A. He said if [Mother] were out of the picture, he would be interested in getting [S.R.M.].

Q. If [Mother] were out of the picture, would he be interested?

---

[4]Interestingly, Father admitted that it was around this time his mother-in-law learned of S.R.M.'s existence.

A.  By inference.

Ms. Rowland met in person with Father and Wife on October 12, 2005.  At that time, the couple reiterated the same concerns about Mother's mental state.  According to Ms. Rowland, at this meeting, Father, for the first time, inquired about S.R.M.'s well-being.  Ms. Rowland claimed that she offered Father a visit with S.R.M. at this time, but he declined it, stating that he was going to wait until he got custody to visit.  In the meantime, the petition to terminate parental rights was filed on November 18, 2005.  Ms. Rowland eventually set up a visit for Father to see S.R.M. on November 30 (actually held the next day, December 1, 2005).  This was the first visit Father had ever had with his daughter, then just shy of seven years old.[5]

Ms. Rowland further testified as follows regarding her opinion that Father's parental rights should be terminated:

Q.  Ms. Rowland, did you -- after [Father] came forward, did you as the representative of the Department, still wish to terminate his rights?

A.  After he came forward?  After the first meeting?

Q. Yes.

A. Yes.

Q.  Why?

***

THE WITNESS:  After meeting with [Father and Wife] on October the 12th, I felt that we should go forward with the petition to terminate because during the course of our conversation, he told me that he left [S.R.M.] with her mother and that –

***

THE WITNESS:  So, he had left [S.R.M.] in that situation for six years, and then when she came into foster care, he did not find out how she was doing, and that's what I based my decision on.

Father testified that he had asked to see S.R.M. in December 2004, when he delivered Christmas gifts for her to the DCS office, but was told he could not do so.  He indicated that he did

---

[5]Father had seen S.R.M. in December 1999, when he underwent paternity testing, but he had never before visited with her.

not thereafter respond to the Permanency Plan because he thought S.R.M. had been moved into a relative's care. Father claimed that he did not realize his parental rights were placed in jeopardy when he did not comply with the Plan's requirement that he contact DCS to arrange visitation. Despite the fact that the definitions of abandonment were attached to the Plan, he stated, "When you receive something like that, you have no clue what you're looking at." Father contended that he had attempted to contact Ms. Rowland on October 3 and October 10 before meeting with her on October 12, in an attempt to set up a visit with S.R.M. He claimed that he had scheduled a visit prior to the termination petition being filed, only to have it rescheduled by DCS. He asserted that the petition was subsequently filed before a visit could take place.

In an attempt to explain his absence from S.R.M.'s life, Father testified that he and Wife had been unable to get along with Mother. He stated that Mother made harassing telephone calls to him and Wife at their workplaces. He claimed that he was forced to obtain a restraining order against Mother in February 1999, after she showed up at Wife's workplace.[6]

Father observed that while he had no contact with S.R.M. over the years, his parents had visited with her until she was nearly five years old. According to Father, the visitation by his parents only ceased when they too experienced problems dealing with Mother. Father testified that he had believed S.R.M. was in a good environment because his parents had expressed no concerns to him. Further, he had viewed a video of S.R.M. at age three that had given him no cause for alarm. He claimed that later, however, he decided S.R.M. was in an unsafe environment because of the behavior of Mother and her boyfriend.

During Wife's testimony, she confirmed that, initially, the couple decided to have nothing to do with S.R.M. She stated that they were afraid to get involved with Mother. Wife, who signed for the Plan when DCS sent it by certified mail to Father's home address, also confirmed her husband's inaction in regard to the notices and Plan. Additionally, Wife admitted that Ms. Rowland had discussed with the couple the process by which Father's rights could be terminated. She blamed the delay in setting up visits with S.R.M. on the actions of prior counsel.

Mother testified that she had been introduced to Father by a drug-dealer friend and that she and Father became acquainted through marijuana use. She stated that Father dealt drugs at that time and had supplied her with marijuana on three or four occasions. According to Mother, her relationship with Father amounted to a couple of nights. She revealed that Father, upon learning Mother was pregnant, told her that he would pay support, but advised her that he wanted nothing to do with her or the child. She testified that Father informed her that his then girlfriend (current wife) was also pregnant, so he wanted Mother to leave him alone. Mother reported that despite her numerous pleas for Father to be involved in S.R.M.'s life, he had always rebuked her efforts. She

---

[6]Father's mother-in-law, who was unaware of S.R.M.'s existence at this time, owned the business where Wife worked.

observed that he had never provided S.R.M. with birthday or Christmas presents. She admitted that Father had paid the required child support, albeit untimely on occasions.

Mother noted that during the trial, Father approached her and begged her to allow S.R.M. to be put in his care. According to Mother, she had lunch with Father and Wife, was invited into their home to see the room that would be S.R.M.'s if they were awarded custody, Wife helped her obtain a vehicle, and she received clothing and money from Father and Wife.[7]

Dr. Kathryn Flagler, a licensed clinical psychologist, testified that she had been working with S.R.M. since February 2005, seeing her a total of 34 times, and that S.R.M. continued in her care during the time of trial. Dr. Flagler stated as follows regarding S.R.M.'s reaction to Father seeking to gain custody of her:

A. She was very surprised, and she slumped down in her chair and she said why do I have to go to a million different houses? I said well, it's not certain that you are going to move to [Father's] house. There is a court hearing, and I went into the whole thing and tried to explain that to her. And I said, so how does that make you feel? Does that make you feel excited? She said I don't want to live with them. I said well, why not? And she said because I'm so happy with the [Foster Family]. I finally found a place where I'm happy. But will it hurt their feelings? Because she's always worried about everybody else's feelings. I told her you just have to tell the truth.

And then she was really quiet for a minute and I'll never forget this. She was very blank and looked stunned. And then she said I have a thousand tears in my head, and I cannot cry them out. Shortly thereafter, . . . [S.R.M.] and I met with [Father and Wife]. And [S.R.M.] said that she was going to be brave and tell them the truth, but she asked me how she should do it.

What I did to help her along was tell her to write out a list of questions that she wanted to ask [Father and Wife], but when we got in there, she looked at me with these big eyes and she froze and she couldn't do it. So, I expressed to them what she had expressed to me, and I asked her questions. One of her questions was why do you want to take me away from [H.M.H.]?

\*\*\*

A. Why do you want me and [H.M.H.] to be apart? Why do you want me to live with you? I know you're my dad, but I don't even know you. . . .

\*\*\*

---

[7] Wife's family owned a used car lot.

A.  [S.R.M.] was very upset, and said that she just didn't understand, and she was very confused.  This is one thing I've heard her say dozens of times, I finally got to a family where I am welcome and I belong and it's my home and now this."

Dr. Flagler also discussed S.R.M.'s connection to H.M.H.:

A.  . . . [S]he is in a place now with no fighting and has stability and [H.M.H. is] cared for.  That has been a continuing theme in her life.  She felt responsible for [H.M.H.'s] well being.  She feels very maternal towards [H.M.H.]  It would be devastating to be separated from [H.M.H.].  The thought is distressing to her.  Even to [H.M.H.].  She feels that their connection is too strong to change.

Upon questioning by the court, Dr. Flagler testified as follows:

THE COURT:  So, what's the effect of losing . . . a relationship with your birth parent after having met them, however briefly?

THE WITNESS:  I think that too would be unfortunate, but --

THE COURT:  When she -- the first time that she asked or said that she was tired of visiting with  [Father and Wife], that was after they had talked to her about living with them?

THE WITNESS:  Yes.

THE COURT:  And did she have any complaints about visiting with [Father and Wife] prior to that time?

THE WITNESS:  No.  She said they are nice people and they visit me.  Until she knew what their intentions were she didn't have a problem.

***

THE WITNESS:  If she could stay put and continue developing this very strong attachment with the [Foster Family], she would be fine.  You –

THE COURT:  You don't think she would be damaged by not seeing her dad or having that relationship?

THE WITNESS:  Well, I mean, I hate that, but if I had to choose where I think she should go, I would have to say that she should stay –

***

THE WITNESS:  If I had to answer that question, I would say, you know, taking the

-7-

legal issues out of it and looking at the emotional side of it, I think it would be sad to get to know [Father] and then suddenly not have any contact with him. But, I think the bigger sadness is having no contact with the [Foster Family].

THE COURT: Would part of that be based on the fact that she would also be losing her sister if going to [Father and Wife]? I'm saying in a legal standpoint?

THE WITNESS: Yes.

THE COURT: Because they could obviously do, both the [Foster Family] and [Father], can do as they please, after I make my ruling. I mean, other than they'll have to abide by my ruling, but because I have a concern about that, that's another issue. Your bond with a sibling. Do you have any information that you can provide me on the effect of someone losing a sibling at the age she is?

THE WITNESS: Well, it would be emotionally traumatic to lose [H.M.H.] and [A.S.],[8] but it would be more severely so because she was, in the earliest portion of [H.M.H.'s] life, she acted as her mother. So, it would be more than sibling loss in her mind.

As to her discussions with Father, Dr. Flagler testified as follows:

A. [Father] just tried to explain why he had been absent all those years.

Q. What was his explanation?

\*\*\*

A. [Father] said he really didn't know the laws. Her mother is a bad person. We wanted to come forward, but we wanted her to be out of the picture first. We had to protect our family.

Q. His family?

A. He said our family. I said what about [S.R.M.'s] safety? He was worried about [S.R.M.'s] safety, but [Mother] harassed them. It seems like he put it on the back burner. He said that he had a busy life and he had made a lot of mistakes partly because he was young. He can see that [S.R.M.] is happy with the [Foster Family].

\*\*\*

Q. Did he tell you what concerns, if any, he had concerning [S.R.M.'s] safety?

_____

[8]The daughter of S.R.M.'s foster parents.

-8-

A. He had concerns about what she would do to his family. He never said anything about [S.R.M.'s] safety.

Dr. Thomas Hanaway, another licensed clinical psychologist, testified on behalf of Father. He visited Father's home, observed Father and the family interact with S.R.M. on several occasions, watched S.R.M. interact with the Foster Family, and met with the Foster Family. Dr. Hanaway found Father to have a stable home, observed Father and Wife doing a good job of parenting their children, and found the home to be well kept and reasonably tidy. Dr. Hanaway observed S.R.M. engaged in appropriate, affectionate physical contact with Father and noted that she seemed to enjoy her time in Father's care. He admitted, however, that S.R.M. would prefer to stay with the Foster Family. Dr. Hanaway testified that he could not tell the court that S.R.M. needed to go to Father because, admittedly, she was more attached to the Foster Family. He did not think it would harm S.R.M. to continue to see Father, and he believed that S.R.M. was capable of increasing her bond with Father. On cross-examination, however, Dr. Hanaway stated, "I kind of shudder" at the thought of S.R.M.'s relationship with H.M.H. being severed. He opined that "there would be a hole in her life," and "I'm sure she would grieve."

As to why Father had been absent from S.R.M.'s life, Dr. Hanaway testified that Father had told him that

> he was afraid that -- he said that [Mother] was a manipulative individual. She would do whatever it took to get what she wanted out of people, and he was afraid that she might raise sexual abuse charges against him and he might end up going to prison, even though he hadn't done anything like that. So, he said he chose to pay child support, but not to have contact with [S.R.M.].

Upon questioning by the court, Dr. Hanaway testified as follows:

THE COURT: Do you have an opinion as to whether the effect, not whether it's substantial, the harmful effect on [S.R.M.] would be greater if she was -- if her custody was given to her father or if her custody remained with the [Foster Family]?

THE WITNESS: Well, my position all along has been that it would be easiest for [S.R.M.] to stay with the [Foster Family]. That's her preference, and I think she's thought that out well. I think [Father and Wife] have a better shot at custody if you use a substantial. . . .
If it's just an equal, just looking at it like just two parents, then I think it would be easier for her to stay with the [Foster Family]. That's my opinion.

THE COURT: And when you say easier, I guess I'm not just looking --

THE WITNESS: Well, there would be less harm.

THE COURT: Okay. That's really what I'm looking for because easier is sometimes easier in the short term but harder in the long term.

THE WITNESS: No. I think it would be good if she can maintain contact with Father just because he is her father, but I think that there would be less grief, less stress if she stays with the [Foster Family].

Jan Gardner, who supervised Father's visits with S.R.M., testified that Father and his family had visited faithfully since December 21, 2005. She added that Father and S.R.M. interacted well and played together appropriately.

On March 5, 2007, the Referee verbally announced her findings and recommendations. She found by clear and convincing evidence that the parental rights of Father should be terminated. The written order of the Referee was entered on December 3, 2007. Three separate grounds were found: abandonment, substantial noncompliance with the Permanency Plan, and persistent conditions.[9] The order provided as follows:

The Court finds that [Father] willfully abandoned this child pursuant to T.C.A. 36-1-113(g)(1) and as defined in T.C.A. 36-1-102. This abandonment took place on two separate occasions. The Court finds by clear and convincing evidence that [Father] willfully abandoned this child by failing to visit for the four consecutive months . . . immediately preceding the filing of the petition to terminate his parental rights. The Court finds that he requested token visitation as defined in T.C.A. 35-1-102(1)(C) after being advised that a petition to terminate his parental rights was being filed. This is exactly why the legislature provides this section of the statute concerning token visitation. [Father] initially willfully abandoned this child when he and his wife agreed to have no contact with the child due to the fact that he was worried about false allegations or a threat to his family. This was done after he reportedly knew that the mother was drug addicted and, in his own words, was crazy. All of those concerns could have been addressed at a Court hearing if he had requested custody of the child or a hearing. He left the child with the mother when he states that he was afraid of her. The Court finds that he willfully abandoned the child for a second time in 2004 when he was notified that the child was in the custody of the Department of Children's Services. His only requirement on the initial permanency plan was to contact the Department of Children's Services within thirty (30) days and he failed to take any action. The permanency plan stated that he could have supervised visitation. [Father] declined to have the children placed in his home and denied knowledge of any relative to take the children. He also expressed doubt that the child [S.R.M.] was his child due to the fact that the mother knew the person performing the DNA test. He was asked to enter a permanency plan in September 2005 but declined to do so. Abandonment may not be repented of by resuming

---

[9]On appeal, Father has not specifically addressed any ground but abandonment, even though the existence of any of the statutory bases will support a termination of parental rights. *See In re C.W.W.*, 37 S.W.3d 467, 473-74 (Tenn. Ct. App. 2000).

visitation as he has done in this case.  T.C.A. 36-1-102 (1)(F).

***

The Court finds by clear and convincing evidence that the father's parental rights should be terminated based on Tenn. Code Ann. Section 36-1-102(1)(A)(ii) that is also an abandonment grounds. . . .

The Court finds by clear and convincing evidence that the child [S.R.M.] was dependent and neglected at the time of the removal due to the abandonment by her father, [J.W.J.]  The Court finds  that the Department made reasonable efforts for more than the four (4) months following the removal to prevent the children from remaining in foster care unnecessarily.  The Department promptly notified [Father] that his child and her younger sister were in foster care.  The Court finds that [Father] did not avail himself of the opportunity to have his child placed in his home when she was initially placed in foster care and that [Father] made no reasonable effort to provide a suitable home for the child prior to the filing of the petition to terminate his parental rights.  The Court finds that he has demonstrated such a lack of concern for the child to a degree during the first six years of her life that it appears unlikely that he will be able to provide a suitable home for the child at an early date.  [Father] has repeatedly expressed concern for himself and his family, but not for [S.R.M.]. [Father] has visited the child since he was notified that the petition to terminate his parental rights was filed.  He has not sought the psychological help necessary to parent this child.  He has not sought help for his son who has or will obviously be impacted by this change in his life.  He has refused to consider the physiological impact that this move would have on [S.R.M.] or on her younger sister, [H.M.H.]. He has refused to consider the opinions of the expert witnesses in this matter.

The Court finds that the child has been removed for a period of more than six (6) months as cited in T.C.A. 36-1-113(g)(3) . . . The Court finds that [Father] has not taken the steps necessary to have this child placed in his home by failing to complete the reasonable requirements of his permanency plans and he appears to have no insight into the necessary steps.  The child is currently placed with her sister in a foster home that will adopt both children and that will be a stable and permanent home for [S.R.M.] and her younger sister, [H.M.H.].

The Court finds that termination of parental rights is proper under Tenn. Code Ann. Section 36-1-113(g)(2) . . . .

The Court finds that there is clear and convincing evidence that the parental rights of [Father] should be terminated due to the fact that he has failed to substantially comply with his permanency plans as required by T.C.A. 36-1-113(g).  The father received the initial plan via certified mail and has acknowledged that he received at that time the criteria and procedures for termination of parental rights.  The court had approved the permanency plans and again specifically finds that the plans were

-11-

reasonable and that the responsibilities set out in the permanency plans were directly and reasonably related to the conditions which necessitated foster care placement. The initial plans required that [Father] contact the Department and enter a permanency plan. [Father] failed to do so. The initial plan that he testified that he read stated that he was entitled to supervised visitation and he failed to avail himself of that visitation. After the petition to terminate was filed[,] . . . he agreed to enter a permanency plan and he agreed to complete the items on the plan. He had refused to enter a plan prior to the time that the petition to terminate his parental rights was filed. He has failed to have individual or family counseling according to his witness, Dr. Thomas Hanaway. Dr. Hanaway testified that he had seen [Father] for evaluation only. He has not provided his son . . . with counseling as required under the permanency plan. [Father] testified that he had completed the plan. He has not taken any responsibility for his actions and this is another excuse of why he is not responsible for anything. He appears to have no insight into the effects that his actions have had and are continuing to have on this child.

***

In addition to finding by clear and convincing evidence that statutory grounds exist to terminate parental rights, the court must also find that the termination is in the child's best interest. The Court finds that the termination of the father's parental rights is in the children's best interest in this case. . . .

. . . The Court finds that [Father] has not made any substantial change or adjustment to his life style. He testified that "his family" is more important than [S.R.M.] and this has not changed. He failed to put his own fears aside to protect this child. The father had made only token statements to work with the mother. He told two people, Dr. Hanaway and Jan Gardner, that the mother is on meth. The father never came forward because of and in spite of his knowledge that the child was living with someone that he himself feared. He has not had any individual therapy as required by his permanency plan. He has shown little to no remorse about abandoning this child for the first six years of her life or for leaving her in foster care. His excuse is only "I was young."

[Father] has exercise[d] visitations since the petition to terminate was filed but the Court finds that there is no meaningful relationship between [Father] and [S.R.M.]. This [lack of a] meaningful relationship is not due to the prolonged time involved in this trial but is due to the lack of contact with the child for the first six years of her life. The child says the visits are enjoyable but she has no desire to live with him and does not know why he wants her. She has stated that she does not even know him. This is due to his delay and lack of contact in the first six years of her life. Dr. Flagler's testimony is given great weight. She has had thirty four visits with the child over a period of two years. The Court recalls the testimony where the child said that the thought of living with [Father] causes her to shed "1000 tears in her head." The Court finds that her most and only meaningful relationship is with her foster parents, her sister and the foster parents' child. It is in [S.R.M.'s] best interest

-12-

for she and her sister to be adopted together. She asked why this happened just when she found a mommy and she has a strong and parentified relationship with her sister. Her father testified that he would maintain this relationship but there is not evidence of that and the Court finds that he would not do so if it conflicted with his family. The Court makes a specific finding that [Father's] testimony was not credible and that [Wife's] testimony was evasive.

The Court also looked at the effect of change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition. The Court also looks at the best interest of the other child in this matter, [H.M.H.]. [S.R.M.] has expressed a strong preference to remain with her foster parents and asks why does this have to happen just when I have found a mommy. [S.R.M.] and her sister [H.M.H.] are placed together and the foster parents will adopt them together. Dr. Hanaway said that he would [shudder] to think what would happen if they were separated and Dr. Flagler testified that it would cause so much damage that therapy would be like a teaspoon in the ocean. [S.R.M.] has a very strong relationship with her sister due to the hardships that the children have endured. This bond has been described as somewhat parentified with her sister. Both Dr. Flagler and Dr. Hanaway testified concerning the effect of this separation. Both experts agree that the loss of this bond would have a more devastating effect than the los[s] of the bond with either the foster parents or the biological father. The father states that he would maintain this bond if possible. However, he has testified that he would follow the recommendations of the therapists in this matter but has failed to do so. [H.M.H.'s] parents would have no legal obligation to allow further contact. There is no evidence that the father would pursue any contact if he thought that it was a threat to his family.

The Court finds that the father has exhibited prolonged and conscious neglect of this child [i]n the past. He left her in a situation where he believed a child in the home was being used to forward false allegations of sexual molestation. He believed that illegal drug use was occurring in the home. He believed that the mother and primary caregiver of his child was unstable and crazy. The father did not maintain any visitation with the child or other contact with the child for six years and did not request visitation while the child was in foster care until advised that a petition to terminate his parental rights was being filed. The father did nothing to get his child out of foster care prior to being advised that a petition to terminate his parental rights was being filed. [Father] allowed the children to be placed in foster care and to remain in foster care and to become bonded with the foster parents. Then, after the children were stable in this foster home and had been in custody for a year, he demanded visitation with [S.R.M.]. The Court finds that [t]here is no father-daughter relationship between [Father] and [S.R.M.]. The father has no insight into the emotional needs of his daughter and this is detrimental to the child and would prevent him from effectively providing [ ] safe and stable care for the child. The Court finds that [S.R.M.] has had a hard life and that it is largely the father's fault due to his failure to help her.

-13-

The Referee's order was adopted by the Juvenile Court Judge and filed with the Juvenile Court on April 14, 2008. Father filed a timely appeal.

## II. ISSUES FOR REVIEW

The issues we address in this appeal are restated as follows:

1. Whether the Juvenile Court properly terminated Father's parental rights on the ground of abandonment.

2. Whether termination of Father's parental rights was in the child's best interest.

3. Whether the termination of parental rights should be reversed because the petition failed to comply with the requirement of Tenn. R. Civ. P. 9A that it contain language advising Father of the expedited appeal provisions of Tenn. R. App. P. 8A.

## III. STANDARD OF REVIEW

The Tennessee Supreme Court has pronounced the standard of review for cases involving termination of parental rights to be as follows:

> This Court must review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this court's duty is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions. *See Troxel v. Granville*, 530 U.S. 57, 6, 120 S.Ct. 2054, 2059-50 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). While this right is fundamental and superior to the claims of other persons, it is not absolute. *State Dep't of Children's Servs. v. C.H.K.*,

-14-

154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination. T.C.A. § 36-1-113(c)(1) (2005); *In re F.R.R., III*, 193 S.W.3d at 530. Second, they must prove that terminating the parent's parental rights is in the child's best interest. T.C.A. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

T.C.A. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *In re Marr*, 194 S.W.3d 490, 496 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546. It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

## IV. DISCUSSION

### A.

The Juvenile Court found grounds to terminate Father's parental rights pursuant to T.C.A. § 36-1-113(g)(1), which designates "abandonment" as a ground for the termination of parental rights. Abandonment is defined in T.C.A. § 36-1-102(1)(A)(i) as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) . . . have willfully failed to visit . . . .

Father does not dispute that he failed to visit in the four months before the petition was filed on November 18, 2005. He argues, however, that finding a ground for termination is not appropriate if that parent is actively pursuing a remedy to the problem. *See In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252 (Tenn. Ct. App. M.S., Apr. 27, 2007).

Father in this case, unlike the father in *Chelbie F.*, never attempted to enforce his visitation rights until after the petition to terminate his parental rights was filed. Father did not visit S.R.M. at all in the years before she came into custody. After his daughter came into custody, he rebuffed

-15-

repeated efforts by DCS to involve him in her life.  Ms. Rowland testified that he rejected her final offer for visitation with his child before filing the termination petition.  Only after the petition was filed did Father repent and make efforts to involve himself in S.R.M.'s life.

T.C.A. § 36-1-102(1)(F) provides as follows:  "Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child."  Father had numerous opportunities to seek visitation prior to the filing of the petition.  The child was in foster care -- away from Mother -- for over a year before the termination petition was filed.  The statute precludes consideration of Father's "after-the-fact" efforts to thwart termination of his parental rights.

Given all the evidence of record that Father willfully failed to visit with S.R.M. in the four months before DCS filed the termination petition, we find that clear and convincing evidence supported  the Juvenile Court's decision to terminate Father's parental rights to S.R.M. pursuant to T.C.A. § 36-1-113(g)(1).

**B.**

In order to terminate parental rights, a court must determine that clear and convincing evidence proves not only that grounds exist, but also that termination is in the child's best interest.  T.C.A. § 36-1-113(c)(i) and (ii).  The legislature has mandated how a court should make the latter determination:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)  Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)  Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)  Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i).

This court has noted that "[t]he listed factors are not exhaustive.  The statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. M.S., May 10, 2002).  The General Assembly has indicated that "when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed."  T.C.A. § 36-1-101(d).

Father claimed that he was making an attempt to visit S.R.M. in the four months prior to the filing of the termination petition.  He noted that he sent a letter to DCS expressing his desire to have S.R.M. in his life and observing that his family was incomplete without her.  He testified that, in October 2005, he had been in telephone contact with Ms. Rowland and met with her for the purpose of getting custody of his daughter.  Father observed that he retained an attorney for the purpose of trying to get custody of S.R.M.  Thus, he contended  that the evidence on the child's best interest is far from clear and convincing.

In this case, Father had rebuffed the repeated reasonable efforts of DCS workers to involve him in S.R.M.'s life.  *See* T.C.A. § 36-1-113(i)(1) and (2).  He had maintained no regular visitation with his daughter until after the termination petition was filed.  *See* T.C.A. § 36-1-113(i)(3).  He had no meaningful parental relationship or bond with his child.  *See* T.C.A. § 36-1-113(i)(4).  The change of caretakers from her foster family, which included her intensely-bonded half-sister, would have devastated S.R.M. emotionally.  *See* T.C.A. § 36-1-113(i)(5).  Dr. Hanaway, Father's witness, testified that S.R.M. would be better off remaining in her bonded foster family.  It is significant that Father had neglected S.R.M. for her entire life until the termination petition was filed, leaving her with a mother he knew to be unfit because he feared only for his own personal welfare.  *See* T.C.A.

§ 36-1-113(i)(6). All these factors provided clear and convincing evidence supporting the Juvenile Court's determination that termination of Father's parental rights was in S.R.M.'s best interest.

## C.

Father argues that the Juvenile Court's decision should be reversed and S.R.M.'s legal status reset to zero because DCS failed in its initial petition to advise him of the expedited appellate time frames in Tenn. R. App. P. 8A.

The first day of the trial was devoted to Father's motion to dismiss in which he argued that the petition to terminate should be dismissed for its failure to comply with Rule 9A of the Rules of Civil Procedure. The rule requires a petitioning party to include in a petition to terminate parental rights language apprising the other parties of the existence of expedited appellate time frames contained in Tenn. R. App. P. 8A. The motion provided as follows:

1. That Tennessee Code Annotated § 36-1-113 has certain requirements that are to be included in a Petition to Terminate Parental Rights.

2. More specifically, in TCA 36-1-113(d)(3)(C) "The Petition to terminate or the adoption petition which seeks to terminate parental rights shall state that: (i) The Petition or request for termination in the adoption petition shall have the effect of forever severing all the rights, responsibilities and obligations of the parent or guardian to the child who is the subject of the Order and of the child to all those parents or guardians."

3. Petitioner [Father] would show that the petition to terminate in this cause does not contain the required language as noted above.

DCS counsel informed the court that she had filed a motion to amend the petition so as to comply with Tenn. R. Civ. P. 9A. She argued that the requirements of Tenn. R. Civ. P. 9A are directory rather than mandatory. She further asserted that Father could not possibly have been prejudiced by her failure to include language from Tenn. R. Civ. P. 9A in the termination petition, as Rule 9A simply refers parties to special appellate procedures under Tenn. R. App. P. 8A and its omission could cause no prejudice at trial. According to DCS counsel, Father clearly had the notice contemplated under Tenn. R. Civ. P. 9A, since it was he who pointed out the omission to the Juvenile Court. The Juvenile Court granted her petition to amend the termination petition to include the omitted language. Father's motion to dismiss was denied.

On June 7, 2006, Father filed a motion in limine in which he recognized that the Juvenile Court had previously granted DCS's motion to amend the termination petition. On June 12, 2006, the Juvenile Court entered an interim order containing the following language:

The Department presented a motion to amend and this motion is granted. Amendment A is ordered attached to the petition and the parents are now given notice of their expedited appeal rights in this matter if an appeal is filed. The Court found that this was not prejudicial to the Defendants.

The order also held that

the motion of the Department of Children's Services to amend is granted and the appeal rights are attached to the Petition to Terminate Parental Rights as Amendment and Exhibit A.

The "Amendment A" referred to in the order is not in the record. We presume that it consists of the language outlined in Tenn. R. Civ. P. 9A, as the Juvenile Court's final order in the case, entered on December 3, 2007, provides as follows:

The petition of the Department was properly amended via pre-trial motion to include the following language:

Any appeal of the trial court's final disposition of the complaint or petition for termination of parental rights will be governed by the Provisions of Rule 8A, Tennessee Rules of Appellate Procedure, which imposes special time limitations for the filing of a transcript or statement of the evidence, the completion and transmission of the record on appeal, and the filing of briefs in the appellate court, as well as other special provisions for expediting the appeal. All parties must review Rule 8A, Tenn. R. App. P. for information concerning the special provisions that apply to any appeal of this case.

Rule 9A merely provides notice of special provisions contained in Tenn. R. App. P. 8A that do not come into play until a matter is on appeal. The purpose of Tenn. R. Civ. P. 9A was satisfied in this case when Father alerted the Juvenile Court and the parties to its existence. Father was not prejudiced by any initial noncompliance with Tenn. R. Civ. P. 9A. Any error was harmless and does not require reversal. *See* Tenn. R. App. P. 36(a). The Juvenile Court did not err in allowing DCS to amend the petition.

Father further argues that the Juvenile Court should have considered the four months preceding the order allowing the amendment to the petition as the relevant time period for the consideration of the abandonment issue. The interim order permitting the amendment was entered on June 12, 2006. In the four months prior to this order, Father was visiting S.R.M. on a weekly basis.

The subsequent amendment merely attached an exhibit to the original petition -- the amendment did not constitute a separate and distinct petition. Pursuant to T.C.A. § 36-1-

102(1)(A)(i), the relevant time period for consideration is the four months immediately preceding the filing of the petition currently before the court. *See In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). The petition that was "currently" before the Juvenile Court was the one filed in November 2005. Father's argument on this issue lacks merit.

## V. CONCLUSION

Although this Court is sympathetic to Father's cause and is saddened to see this Father's relationship with the child come to an end after finally getting started after so long a period of time, nevertheless, after reviewing the applicable factors in light of the facts discussed at length above, we readily conclude that the evidence does not preponderate against the Juvenile Court's conclusion, made by clear and convincing evidence, that Father abandoned the child and termination of his parental rights is in S.R.M.'s best interest.

The judgment of the Juvenile Court is affirmed. Costs on appeal are taxed to the Appellant, J.W.J. This case is remanded to the Juvenile Court for enforcement of the court's judgment and for the collection of costs assessed below, all pursuant to applicable law.

_____
JOHN W. McCLARTY, JUDGE